Denora SARIN, Plaintiff,

v.

RAYTHEON COMPANY, Defendant.

Civ. A. No. 94–11335–MEL.

United States District Court,
D. Massachusetts.

Nov. 15, 1995.

Dennis P. Powers, Katz, Argenio & Powers, Springfield, MA, for Plaintiff.

James F. Kavanaugh, Jr., Conn, Kavanaugh, Rosenthal & Peisch, Boston, MA, for Defendant.

LASKER, District Judge.

Denora Sarin alleges that while he was employed at Raytheon Company, his coworkers made statements and threats regarding his national origin and religion, creating a hostile work environment. He sues Raytheon Company under Title VII and Massachusetts General Laws Chapter 151B, arguing that it is liable for the acts of its employees because it failed to take immediate and appropriate action to remedy the situation. Raytheon moves for summary judgment.

### I.

Denora Sarin, a Cambodian Buddhist, was employed at Raytheon Company as a systems engineer from July 5, 1989 until August 19, 1992, when he resigned. (Sarin Dep. at 23.) From July 1989 through April 1992, Sarin worked on the Phoenix missile program, and from April 1992 until August of the same year, Sarin worked on the AMRAAM missile program. (*Id.* at 25–26.)

The alleged religious harassment began within a week of Sarin's transfer in April 1992 to the AMRAAM missile program.

Alan Goldberg, a union worker, approached Sarin and stated that he knew Sarin was from Cambodia and was Buddhist. (*Id.* at 52–54.) Goldberg asked Sarin, "What Buddhism? [sic] What kind of Buddha [do you worship]? The skinny or the fat one? Are you a Buddhis[t]? I want to fight you. You don't fight me back." (*Id.* at 54.)

Around the same time, Sarin alleges that he was also taunted by other union workers. On two occasions, Jim Casey attached an alligator clip to Sarin's neck and pulled the elastic string attached to it, snapping it on Sarin's neck. (*Id.* at 55–60.) Casey made no verbal comments to Sarin. After Sarin reported the incidents to a supervisor, Casey apologized to Sarin. (*Id.* at 60.) Thereafter, Casey never repeated this conduct. (*Id.* at 64.)

On a separate occasion, Goldberg accused Sarin of lodging poor job performance evaluations with Goldberg's supervisor. (*Id.* at 65.) Sarin denied the accusations, and Goldberg began to mock Sarin's religion, again asking whether Sarin believed in "skinny Buddha, fat Buddha." (*Id.* at 66.) Sarin also reported this incident to his supervisors. (*Id.* at 66–69.)

Two months later, in June 1992, Sarin asked Goldberg to conduct a test, and Goldberg responded, "You not my boss. You no have to tell me what to do." (*Id.* at 84.) Sarin claims Goldberg also called him "a piece of trash" and said, "You don't know me well enough ... I can do a lot of things that you cannot imagine." (*Id.* at 85.) Sarin interpreted Goldberg's statement as a threat and asked, "What? You want to kill me?" to which Goldberg replied, "Nothing wrong with that." (*Id.*) On this occasion, Goldberg also made reference to Sarin's national origin, claiming Sarin had come to the U.S. "to destroy and ruin the system of this country." (*Id.* at 84.) Sarin again reported this incident to his supervisors (*Id.* at 87–91, 93.) and spent the rest of the evening in his office, trying to calm down. (*Id.* at 91.)

When Sarin next reported to work, Goldberg had been moved by his supervisors to another work station, in response to Sarin's complaint. Sarin alleges that Goldberg

continued to appear at Sarin's work station regularly and stared at him, although he did not speak to or approach Sarin. (*Id.* at 95–96, 105–6, 115–16.) Later that day, Leo Archambault, a union employee who worked at an adjacent station, told Sarin, "Denora, from now on, I have to keep an eye on you. If you take anything, I will break both your hands." (*Id.* at 97.) When Sarin responded that it would be unlawful to do so, Archambault responded, "There's no law here. I pull you to the next station ... I could beat you up there and nobody going to help you." (*Id.*) Archambault made no reference to Sarin's religion or national origin. (*Id.* at 98.) Sarin retreated to his office. (*Id.* at 98–99.)

After reporting this incident to his supervisor the following day, Sarin requested to be laid off. (*Id.* at 102–4.) He was told that could not be done, but that a due process hearing would be arranged by the personnel office. (*Id.* at 105; Caron Aff. at 2–3.) Raytheon conducted an investigation and interviewed various personnel, none of whom witnessed the harassment about which Sarin complained. (Ruest Aff. at 1.)

Although Sarin informed Raytheon that a co-worker by the name of Mary Tabor had witnessed one or more of the incidents reported, she was not interviewed during these proceedings. (Tabor Aff. at 1.) Tabor denies witnessing any incidents in which "any of the union technicians, including Leo Archambault or Alan Goldberg, verbally harass[ed] Mr. Sarin based on his religion or national origin." (*Id.*)

The due process hearing took place on June 25, 1992. (Sarin Dep. at 115–16.) Goldberg denied Sarin's allegations, and Archambault apologized for his behavior. (*Id.* at 111.) No disciplinary actions were taken, but both Goldberg and Archambault were told they would be subject to severe discipline if they harassed Sarin in the future. (*Id.* at 129.)

On June 26, 1992 Sarin met with E.T. O'Brien, who was employed in Raytheon's human resources department. For the purposes of this motion, Raytheon does not dispute that O'Brien accused Sarin of fabricating his accusations. (Def.'s Reply to Pl.'s Opp'n at 2.) After this meeting, Sarin did not work regularly, experienced chest pains and emotional anxiety, and could not sleep or eat. (Sarin Dep. at 121, 153.)

In August 1992, Raytheon offered on three separate occasions to move Sarin to the morning shift. (*Id.* at 126–7.) Sarin declined because that shift would still overlap with Goldberg's and Archambault's shifts for at least one hour. Upon the recommendation of an internist, Sarin resigned from Raytheon on August 19, 1992. (*Id.* at 126, 132, 136–7; Ruest Aff. at 2.)

## II.

Raytheon makes three arguments in support of its motion, the last of which is decisive. First, it contends that as a matter of law the evidence of alleged harassment is insufficient to support a hostile work environment claim under Title VII or Chapter 151B of the Massachusetts General Laws.

Second, Raytheon takes the position that even ·if Sarin experienced discriminatory harassment based on his protected status, the facts do not establish that the alleged behavior rose to a level sufficiently severe or pervasive to create an objectively hostile work environment. Raytheon admits, for purposes of this motion, that Sarin's work environment was abusive and hostile from his subjective point of view. (*Id.* at 20.) However, it points out that the harassment must be judged from the perspective of a "reasonable person" and that the harassment complained of was not sufficient to constitute a "hostile work environment," as defined by the Supreme Court in *Harris v. Forklift Systems, Inc.*, — U.S. —, —, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

Finally, Raytheon asserts that even if Sarin establishes that his work environment was objectively hostile, it cannot be held liable for its employees actions because it took immediate and appropriate action as soon as it became aware of the harassment. *DeGrace v. Rumsfeld,* 614 F.2d 796, 805 (1st Cir.1980); *Saad v. Stanley St. Treatment & Resources, Inc.,* No. 92–11434, 1994 WL 846911 (D.Mass.1994). Raytheon claims that its responses to Sarin's complaints were swift, appropriate and successful in stopping

the alleged harassment at least six weeks before Sarin resigned.

Sarin argues that he has established each of the elements required to support a hostile work environment claim and that Raytheon failed to take immediate, appropriate action to eliminate the problem. Sarin alleges that Goldberg's comments about Sarin's religion (the references to Buddha) and his religious beliefs (that Sarin would not fight back because of his beliefs) were "unwelcome comments ... of an ethnic and/or religious nature." (Pl.'s Mem. in Supp. of Opp'n to Summ. J. at 6.) In addition, Sarin argues that "one of Goldberg's union co-workers ... approached [Sarin] and threatened him with physical harm" and that "a reasonable inference can be drawn that [Archambault] acted at the request of Goldberg." (*Id.*) Sarin contests Raytheon's suggestion that the harassment experienced by Sarin was "general, everyday harassing interactions between union technicians and management engineers," not based on his national origin or religion. (Pl.'s Aff.; Def.'s Mem. in Supp. of Summ. J. at 15.)

Sarin contends further that "although there were only four incidents, these incidents were severe, physically threatening and interfered with [Sarin's] work performance." (Pl.'s Mem. in Supp. of Opp'n to Summ. J. at 8.) On deposition, Sarin testified that he left his work area each time these incidents occurred in order to calm himself, and that as a result of these incidents, he developed physiological symptoms. (*Id.*; Sarin Dep. at 121, 153.)

### III.

■ The elements of a discrimination claim based on a hostile work environment created by non-management employees are the same under federal and Massachusetts law. Section 1606.8(b) of the Code of Federal Regulations provides

(b) Ethnic slurs and other verbal or physical conduct relating to an individual's national origin constitute harassment when this conduct: (1) Has the purpose or effect of creating an intimidat-

ing, hostile or offensive working environment; (2) has the purpose or effect of unreasonably interfering with an individual's work performance ...

(d) With respect to conduct between fellow employees, an employer is responsible for acts of harassment in the workplace on the basis of national origin ... unless the employer can show that it took immediate and appropriate corrective action.

29 C.F.R. § 1606.8 (West 1995). Section 1606.2 provides that Title VII similarly protects individuals against employment discrimination on the basis of religion. 29 C.F.R. § 1606.2 (West 1995). Massachusetts General Laws Chapter 151B, § 4(1) provides that it is unlawful

[f]or an employer, by himself or his agent, because of the ... religious creed, national origin, ... or ancestry of any individual ... to discriminate against such an individual ... in terms, conditions or privileges of employment, unless based on a bona fide occupational qualification.

(West 1982 and Supp.1995). Under both statutes, Sarin must make a showing that 1) unwelcome comments, jokes, acts, and other verbal or physical conduct of an ethnic and/or religious nature were made in the workplace; 2) such conduct had the effect of creating an intimidating, hostile, or offensive working environment or unreasonably interfered with an individual's work performance; and 3) the employer knew or should have known of the conduct. *Duplessis v. Training & Development Corp.*, 835 F.Supp. 671, 677 (D.Me. 1993); 29 C.F.R. § 1606.8 (West 1995); *see Wheatley v. AT & T*, 418 Mass. 394, 397, 636 N.E.2d 265 (1994) ("It is our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. C. 151B.")

■ Once the plaintiff has established these propositions, the employer may defeat liability under Title VII and Chapter 151B by showing that it took immediate and appropriate corrective action in response to its non-management employees' harassing conduct.[1]

---

**1.** Note that the effect of adequate remediation on employer liability for harassment committed by a

College–Town, Div. of Interco, Inc. v. M.C.A.D., 400 Mass. 156, 166–67, 508 N.E.2d 587 (1987); Duplessis, 835 F.Supp. at 677; Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 898–901 (1st Cir.1988).

■ Because this decision is based on the adequacy of Raytheon's response, it is unnecessary to determine whether, objectively measured, the conduct described by Sarin was actionable under Title VII and Chapter 151B. For even assuming that Sarin has established a prima facie case for a hostile work environment claim, Raytheon's remedial action was legally sufficient to shield it from liability. Thus, Raytheon's argument that it cannot be held responsible for its employees actions because it took immediate and appropriate action once it became aware of the harassment is decisive.

The harassment Sarin complains of consisted of three confrontations with Goldberg which involved clear, but limited references to religion and/or national origin; two incidents involving Casey and an alligator clip; and one incident involving physical threats made by Archambault. Because the undisputed facts establish that Raytheon took "immediate and appropriate action" upon learning of each incident Sarin describes, its motion for summary judgment must be granted.

Sarin does not dispute that his supervisors spoke with Casey as soon as they learned of the incident involving the alligator clip; that the due process hearing was within days of Archambault's threat; that both Casey and Archambault apologized to Sarin once reprimanded by their supervisors; or that no further incidents involving Casey and Archambault arose after these meetings. While Goldberg was less cooperative, even he discontinued the verbal harassment after being moved to another work station.

■ Sarin argues that Raytheon's efforts to remedy the situation were inadequate because Raytheon did not take disciplinary action against Goldberg, Casey, and Archambault; it did not interview an employee Sarin

identified as a witness to one or more incidents; and its investigation was flawed by O'Brien's accusation that Sarin fabricated his allegations. Although Sarin remains dissatisfied with Raytheon's remedial action,

the chief measure of the adequacy of an employer's response is not the victim's own personal sense of justice, but rather—particularly where there is no prior history of workplace harassment—whether the behavior that gave rise to the complaint has ceased and does not threaten to reoccur.

Saad, 1994 WL 846911 (D.Mass.1994). Raytheon's remedial action with respect to Casey and Archambault was immediate, appropriate, and successful; after that action their behavior and Goldberg's verbal harassment neither continued nor threatened to recur.

Nor does Raytheon's failure to interview Mary Tabor render its remedial action inadequate. The test of the pudding is in the eating: Whether Tabor was interviewed during the investigation is insignificant, because the investigation which was made cured the harassment.

This is not a case such as College–Town, in which the employer's remedial actions were inadequate because it "did not conduct a fair or thorough investigation of [the alleged] sexual harassment ... no disciplinary action was taken, nor were warnings issued to [the offender]." 400 Mass. at 167–168, 508 N.E.2d 587. Here, Sarin's supervisors at Raytheon responded promptly to each incident Sarin brought to their attention, warned the offenders that any subsequent discriminatory conduct would constitute grounds for severe discipline, and, except for failing to interview Tabor, conducted a full investigation. As the Court of Appeals of this circuit said in DeGrace v. Rumsfeld, where an employer

has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct, we do not think he can be

supervisor is not the same under Title VII and Chapter 151B. Under Title VII, an employer's remedial actions can shield it from liability for harassment committed by a supervisor. Under

Chapter 151B, however, an employer is unconditionally liable for sexual harassment by its supervisors.

**54**

charged with discriminating on the basis of race.

614 F.2d at 805.

Finally, it is worth noting that although Raytheon's motion is granted on the basis of the promptness and adequacy of its remedial action, Raytheon's argument that the incidents described did not reach the level of a "hostile work environment" is persuasive and might well constitute a separate ground for granting summary judgment. The standard of review, as reaffirmed by the Supreme Court in *Harris v. Forklift Systems, Inc.,* —— U.S. ——, —— – ——, 114 S.Ct. 367, 370–371, 126 L.Ed.2d 295 (1993), establishes that the

> mere utterance of an ... epithet which engenders offensive feelings in an employee ... does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.

*Id.,* 114 S.Ct. at 371. Only Goldberg's comments regarding Sarin's religion and national origin were actionable under this standard, although the other conduct is to be weighed in considering the totality of the circumstances. *See also Lewis v. Gillette Co.,* No. 90–12257, 1993 WL 291771, 1993 U.S. Dist. LEXIS 10239 (D.Mass.1993), *aff'd* 22 F.3d 22 (1st Cir.1994) (where the alleged gawking or staring, while possibly bothersome, was "not sufficiently severe or pervasive to constitute actionable harassment.")

Raytheon's motion for summary judgment is granted.

It is so ordered.