Michael J. WARD, Plaintiff,

v.

MASSACHUSETTS HEALTH RESEARCH INSTITUTE, INC., Defendant.

Civil Action No. 96–11555–GAO.

United States District Court, D. Massachusetts.

May 6, 1999.

Michael J. Ward, Roslindale, MA, pro se.

Marjory D. Robertson, Lindsay Smith Kafka, Hill & Barlow, Boston, MA, Richard L. Alfred, Robert A. Bertsche, Boston, MA, for defendant.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

Plaintiff Michael Ward, terminated from his employment at Massachusetts Health Research Institute, Inc. ("MHRI"), seeks redress under the Americans with Disabilities Act ("the ADA"), 42 U.S.C. § 12101 *et seq.*, and the Massachusetts anti-discrimination statute, Mass.Gen.Laws ch. 151B, § 1 *et seq.*, asserting wrongful discharge, failure to provide a reasonable accommodation to his disability, and creation of a hostile work environment. MHRI has moved for summary judgment on all counts. For the reasons set forth below, MHRI's motion is GRANTED.

### I. *Factual Background*

The relevant facts, viewed in a light most favorable to Ward, are as follows:

In September 1991, MHRI hired Ward as a "Lab Tech I." Ward was to divide his time, serving both as a laboratory assistant, where he would help chemists prepare and conduct tests on plasma, and as an assistant to the plasma program coordinator, where he would perform data entry and record keeping functions. When he was hired, Ward did not indicate that he suffered from a disability or required any accommodation to perform his anticipated duties.

Throughout the term of Ward's employment, MHRI maintained a "flex-time" schedule that allowed all employees · to start work any time between 7:00 a.m. and 9:00 a.m. and leave for the day after they had worked for seven and one-half hours. At first, Ward regularly arrived at work before 9:00 a.m. Beginning in early 1992, however, Ward frequently arrived after 9:00 a.m. Mostly he arrived between about 9:10 a.m. and 9:35 a.m., but occasionally he would arrive as late as 10:00 a.m. and even 12:00 noon. Whatever his arrival time, Ward always worked the required seven and one-half hours.

In a December 1992 performance review, Ward's supervisor rated his overall job performance as being "below" expectations. The review noted that the "uncertainty of Michael's arrival to work" made it difficult for him to receive the training necessary to perform his lab duties. The review further stated that "Michael needs to coordinate his daily work schedule more closely with his coworkers in order to maximize efficiency." Def.'s Mot. for Summ. J ., Ex. 1, Ferren–Gardner Aff., Ex. B at 4. Ward acknowledged his agreement with this evaluation, though he also noted that he always worked a full day. Notably, Ward did not protest that any physical condition or disability prevented him from arriving at work when expected.

After the unfavorable review, Ward was issued a verbal warning, a summary of which was memorialized in a memorandum added to Ward's personnel file. *Id.*, Ex. 1, Ferren–Gardner Aff., Ex. A, Memorandum, Dec. 29, 1992, at 1. In the memorandum, his supervisor reiterated that the acceptable arrival time was between 7:00 a.m. and 9:00 a.m., and noted that Ward had not made it to work by 9:00 a.m. in over three months. She also re-emphasized MHRI's policies regarding breaks, sick time and "comp time," all of which

Ward was alleged to be abusing.[1] Finally, the supervisor reassigned Ward full-time to a data entry position because his lack of "self-motivation" and need for more direct supervision required that he be relieved of his laboratory duties. *Id.* at 2.

During 1992, Ward visited doctors on several occasions. There were signs of arthritis evident in Ward's right hip, with "severe degenerative changes in the superior compartment." Pl.'s Opp'n, Ex. 2, Cohen Aff., Ex. I, Dr. Wohlgethan evaluation, Nov. 4, 1992, at 49. His left hip showed "minor degenerative disease," *id.*, and there was "mild synovitis" in his left elbow. *Id.*, Dr. Wohlgethan evaluation, Nov. 4, 1992, at 48. It does not appear that Ward advised MHRI about these evaluations or supplied any medical information to MHRI during 1992.

Ward continued to be tardy for work during 1993. In a July 1993 evaluation, his supervisor again addressed the issue of his frequent tardiness:

> Mike also has a problem with arriving to work on time. This issue has been addressed previously, and Mike's performance in this area has not improved. Arrival by 9:00 AM is imperative in order for Mike to continue his employ in the Screening Laboratory.
>
> Def.'s Mot. for Summ. J., Ex. 1, Ferrin–Gardner Aff., Ex. C, Performance Review, July 29, 1993, at 9.

The review also made reference to Ward's need for constant supervision in order to complete his work in a timely manner.

Following this evaluation, one of Ward's doctors sent the following short handwritten note to MHRI, dated August 4, 1993:

> Mr. Ward is a patient whom I have seen at the West Roxbury HCHP Center. He suffers from an inflammatory arthritis, which may from time to time cause swelling and pain of the joints and interfere with activities.
>
> *Id.*, Ex. 4, Robertson Aff., Ex. A, Dr. Wohlgethan letter, March 4, 1993, at 2.[2]

The letter did not connect Ward's arthritis with his tardiness, nor did it suggest that Ward needed any particular workplace "accommodation."

On August 13, 1993, Ward's supervisor issued him a written warning that recounted a number of perceived performance problems. Relevant to the present issues, the supervisor addressed Ward's inability to arrive at work by 9:00 a.m.: "You have not arrived to work on time (by 9:00 AM) since June 4, 1993 (2 months ago), although you have been spoken to regarding this on many occasions." *Id.*, Ex. 1, Ferren–Gardner Aff., Ex. D, Memorandum, Aug. 13, 1993, ¶ 11 at 2. The warning concluded: "From this date, the first time you fail to perform your responsibilities as addressed above, further disciplinary action will be taken, up to and including dismissal." *Id.*, Ex. D at 3.

His supervisor and another MHRI employee claim to have observed Ward arrive late on October 21, 1993, but enter his time of arrival as 9:00 a.m. *Id.*, Ex. 1, Ferren–Gardner Aff. ¶ 21; Ex. 2, Fitzmaurice Aff. ¶ 9. As a result of the incident, MHRI suspended Ward for three days without pay. Ward maintains that he did not falsify the entry.

When Ward returned to work, he submitted a new employment application in which he claimed to have a disability.[3] He

---

1. For example, the memorandum states, "It was emphasized that sick time is not to be used to cover being late." Def.'s Mot. for Summ. J., Ex. 1, Ferren–Gardner Aff., Ex. A, ¶ 6.

2. It does not appear that the doctor who wrote the note had seen Ward at the time. Ward's medical records show no visit with this particular doctor between November

1992 and March 1994. *See* Def.'s Mot. for Summ. J., Ex. 4; Robertson Aff., Ex. A at 2.

3. In response to a question in the application that asked whether he had "any disability which would interfere with [his] ability to perform the duties of the position applied for," Ward responded, "Yes, I have a disability, which though not preventing me from performing + completing my duties, does

also spoke by telephone with Patricia Leonard, MHRI's director of human resources, and asserted that his arthritis interfered with his ability to arrive at work by 9:00 a.m. He asked to be permitted to arrive after 9:00 a.m. on days when his arthritis forced him to be late, so long as he worked the required seven and one-half hours. Leonard rebuffed his request on the ground that the two-hour window for arrival between 7 a.m. to 9 a.m. provided him enough flexibility with respect to arrival time. Ward did not provide, nor did Leonard seek, any further medical information regarding his arthritic condition.

Four months later, on March 4, 1994, after Ward had arrived after 9:00 a.m. on two consecutive days, MHRI terminated his employment.

At the end of March, Ward's doctor wrote a letter to MHRI in which he discussed Ward's arthritic condition, noting that the pain it caused Ward interfered with his sleeping habits. The letter went on to state that "the nature of this condition is that symptoms tend to be worse after a period of inactivity, and are especially prominent in the morning. Mr. Ward suffers his worst achiness and stiffness at that time of day." *Id.*, Ex. 4, Robertson Aff., Ex. A, Dr. Wohlgethan letter, March 30, 1994, at 8. The letter did not address whether the arthritic condition interfered with Ward's ability to arrive at work when expected.

Ward himself has also described in detail his arthritic condition and what he says was its impact on his ability to get to work on time. He says that the earliest he could go to bed was 10 p.m. He would often wake up between 4 and 5 o'clock in the morning and, usually, was unable to fall back asleep. He would then begin the difficult task of overcoming the stiffness in his joints in order to prepare to go to work. Pl.'s Opp'n to Def.'s Mot. for Summ. J., Ex. 1, Ward Aff., ¶¶ 6, 7, 9.

Ward has also claimed that other employees created a hostile work environment for him at MHRI, targeting him because of his disability. He described several incidents. Sometime during the summer of 1993, Ward saw a computer "screen saver" in a lab where several employees were working, which repeated in a loop fashion, "Hear ye, hear ye, come one, come all to see the amazing cripple. He walks, he talks ... he goes to the bathroom again and again." *Id.*, Ex. 4, Ward Dep. at 182. Ward believes the message was referring to him. He discussed the screen saver with Tom Baldwin, his direct supervisor. On another occasion, he saw an anonymous memorandum, part of which read as follows:

We [apparently referring to the anonymous author and Baldwin] didn't spend hours looking for a pencil. We communicated and worked together. If a ship had to be brought upstairs, I did it, and it didn't take me an hour. I wore gloves and a coat. I do not have a problem with temperature, humidity, food, consciousness, air pressure, sound, sunlight, water, pain, my feet, lunar cycles, or precipitation. I don't care if my underwear is damp and cold. If you are the kind of person that does suffer from all of these ailments your lifeless lump of flesh could best serve the separation process as a door stop. The key is working together.

*Id.*, Ex. 2, Cohen Aff., Ex. F.

Ward again believed that he was the person referred to, but this time he apparently did not complain to anyone at MHRI. In August 1993, Ward's work log book was defaced when an individual changed the words "daily work log" to "daily personal injury log." *Id.*, Ex. 4, Ward Dep. at 187–88. Again, Ward did not bring the incident to the attention of any supervisor at MHRI. Also, on at least two occasions,

cause me to expend much more effort than a person without such a disability." Def.'s Mot.

for Summ. J., Ex. 3, Leonard Aff., Ex. C at 1.

extra clothes Ward had brought into work were found under a shower and in the lab freezer. *Id.* at 303.

## II. *Analysis*

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir. 1995). The initial burden of establishing the absence of genuine issues of material facts rests with the movant. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once that has been done, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he would bear the ultimate burden of proof at trial." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir.1998) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (internal quotations omitted). The nonmoving party may not rest on the pleadings, but rather must point to specific facts on the record that establish a genuine triable issue. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Disputed facts are viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in that party's favor. *See Dykes v. Depuy, Inc.*, 140 F.3d 31, 33 (1st Cir.1998). If there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," summary judgment is not appropriate. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not signifi-

cantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

### A. *The ADA*

*Discrimination/Accommodation*

■ The ADA forbids an employer from discriminating "against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a); *EEOC v. Amego, Inc.*, 110 F.3d 135, 142 (1st Cir.1997). An employee claiming to have been discharged in violation of the ADA must establish three necessary propositions: (1) that he was disabled within the meaning of the Act; (2) that he was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) that the employer discharged him in whole or in part because of the disability. *See Criado v. IBM Corp.*, 145 F.3d 437, 441 (1st Cir.1998); *Jacques v. Clean–Up Group*, 96 F.3d 506, 511 (1st Cir.1996); *Katz v. City Metal Co.*, 87 F.3d 26, 30 (1st Cir.1996).

■ Assuming that Ward's inflammatory arthritis would constitute a disability under the ADA,[4] Ward's claim nevertheless fails because, on the record presented, he cannot satisfy the other two elements necessary for a prima facie case; that is, he cannot establish that he was qualified to perform the essential functions of his job with or without a reasonable accommodation, and he cannot prove that MHRI discharged him "because of" his disability.

■ "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires." *Laurin v. Providence Hosp.*, 150 F.3d 52, 56–57 (1st Cir.1998). An ADA plaintiff bears the burden of ad-

---

4. Some courts have been reluctant to classify individuals with arthritis as disabled under the ADA. *See, e.g., Kelly v. Drexel Univ.*, 94 F.3d 102, 106–07 (3d Cir.1996) (holding that a "degenerative joint disease" did not substantially limit the major life activity of walking); *Sutton v. New Mexico Dep't of Children,* 922 F.Supp. 516, 518 (D.N.M.1996) (finding that degenerative arthritis did not translate into a disability); *Graver v. National Eng'g Co.*, No. 94C1228, 1995 WL 443944 at *11 (N.D.Ill. July 25, 1995) (concluding that an arthritis sufferer was not disabled under the ADA).

ducing facts from which a reasonable factfinder could conclude that he was capable of performing the essential functions of the position, with or without a reasonable accommodation. *See id.* at 59.

It is evident from the record that MHRI regarded regular and timely attendance during prescribed work hours to be an essential function of Ward's job. MHRI required all its employees to arrive at work between 7:00 a.m. and 9:00 a.m. Although this policy permitted employees some flexibility in setting the times they would begin their work days, it did not represent *carte blanche* for them to come to work whenever it suited them.

MHRI expected Ward to observe the schedule it had established for employees generally. Ward attempts to downplay any need for him to be punctual by arguing that he was merely a data entry clerk, apparently implying that his was a solitary position in the work force that could be satisfactorily performed at any time, regardless of the schedules other workers kept. In making this argument, Ward in effect seeks to substitute his judgment about the job's requirements for MHRI's. The record reflects that it was MHRI's judgment that Ward's position required managerial supervision.[5] Def.'s Mot. for Summ. J., Ex. 1, Ferren–Gardner Aff., Ex. C at 3. His responsibilities had to be performed "in a timely fashion" and at "[a]n acceptable work pace." *Id.*, Ex. A, ¶ 4(a), Ex. D, ¶ 1. It appears that it was MHRI's judgment that the work of the laboratory could most successfully be accomplished by having employees, including Ward, present during common working hours.

■ An employer's determination as to what constitutes an essential function is entitled to deference in the absence of evidence of discriminatory intent, pretext

or animus. *See Laurin v. Providence Hosp.*, 150 F.3d 52, 57 (1st Cir.1998); *Amego, Inc.*, 110 F.3d at 144–45; *see also Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991) ("Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions."). Ward points to nothing that ought to diminish that deference in this case.

Requirements about work hours are not irrational or unreasonable. A number of courts have recognized that regular, reliable and predictable attendance is commonly an essential function of a job. *See, e.g., Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir.1999) ("It should not require saying that generally attendance is a requirement of a job."); *Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) ("Other courts are in agreement that regular attendance is an essential function of most jobs."); *Tyndall v. National Educ. Centers, Inc. of Calif.*, 31 F.3d 209, 213 (4th Cir.1994) ("Therefore, a regular and reliable level of attendance is a necessary element of most jobs."); *Carr v. Reno*, 23 F.3d 525, 530 (D.C.Cir.1994) (finding "an essential function of any government job is an ability to appear for work"); *Hendry v. GTE North, Inc.*, 896 F.Supp. 816, 825 (N.D.Ind.1995) ("In fact, regular attendance at work is an essential function of virtually all jobs."); *Walders v. Garrett*, 765 F.Supp. 303, 310 (E.D.Va.1991) ("[S]ome degree of regular, predictable attendance is fundamental to most jobs.").

Furthermore, the importance of the requirement of timely arrival at work was repeatedly emphasized to Ward in performance reviews conducted well before he told MHRI that he thought his tardiness was the result of a disability. There is no basis in the record for an inference that

---

**5.** Ward's need for supervision stemmed from both the duties of the position in general, *see* Def.'s Mot. for Summ. J., Ex. 1, Ferren–Gardner Aff., Ex. C at 3 (describing database problems that need to be reported to the Plasma Program Coordinator before proceeding with

the data entries), as well as from his own performance of the job. *See, e.g. id.* (stating "[Ward] seems only to keep a pace equal to his ability if overseen very closely by his supervisor.").

MHRI's insistence on arrival between the hours of 7:00 a.m. and 9:00 a.m. was a late-manufactured pretextual "cover" for some other purpose.

In sum, punctual adherence to an established workday schedule may legitimately be regarded by an employer as an essential function of a position, and there can be no genuine dispute that it was so regarded by MHRI with respect to Ward's position. Although there might be reasons why in a given case such a business judgment should be overridden, Ward has offered no worthy reason why that should happen in this case.

Since timely attendance was an essential function of the job, the next inquiry is whether Ward was capable, with or without reasonable accommodation, of meeting that requirement. His position in this litigation is that his arthritis interfered with his ability to arrive on time, and that MHRI was bound under the circumstances to offer him a reasonable accommodation.

MHRI's policy to give its employees the flexibility of arriving at work anytime between 7:00 a.m. and 9:00 a.m. was itself an accommodation to any employee who might find it difficult to comply with a single, specific time for commencement of work. The further accommodation that Ward seeks, apparently, is that he should be permitted to set his own daily schedule, arriving whenever he is able, so long as he works a full day. That might be a reasonable accommodation in some circumstances, such as where the employee is capable of performing his work on his own, but not in a case, as here, where the employer has a legitimate interest in having its workforce present during common hours so that, for one thing, it might assure that an employee like Ward gets adequate supervision. The accommodation

Ward argues for would not help him fulfill the essential requirement that he keep common hours with other workers, but rather would excuse him from it.[6]

"[A]n employer need not accommodate a disability by foregoing an essential function of the employment position." *Laurin,* 150 F.3d at 56 (internal quotations omitted); *see also Miller v. Illinois Dep't of Corrections,* 107 F.3d 483, 485 (7th Cir. 1997) (employee who cannot perform essential functions of job "so that she would have been fired anyway" is not entitled to relief under ADA); *Borkowski v. Valley Cent. School Dist.,* 63 F.3d 131, 140 (2d Cir.1995) ("It follows that an employer is not required to accommodate an individual with a disability by eliminating essential functions from the job."); *Tuck v. HCA Health Servs. of Tenn.,* 7 F.3d 465, 472 (6th Cir.1993) (finding "an accommodation is not reasonable if it requires eliminating an essential element of the job; and an employer is not required to eliminate an essential element of the job to accommodate a handicapped employee"). Since Ward is unable to perform the essential functions of his position with or without reasonable accommodations, he is not an otherwise "qualified" individual to whom a remedy is available under the ADA.

A second reason why MHRI is entitled to summary judgment in this case is that no reasonable factfinder could conclude that, because MHRI fired Ward for tardiness, it fired him "because of" his claimed disability. Ward did not furnish MHRI, nor has he offered the Court, any medical evidence that his disability was the cause of his frequent lateness. The only medical information MHRI had before it discharged Ward was his doctor's August 1993 letter, which spoke only generally of his arthritis and significantly did not purport to make any connection between

---

**6.** The obligation to provide a reasonable accommodation should not require that MHRI permit Ward more flexibility than it permits its other employees. The question is whether the provided flexibility reasonably permitted Ward to meet the employer's requirement of regular, timely attendance. In this respect, the reasonableness of an accommodation should turn on how well it accommodates the disabled person, not on how much *more* it accommodates him than other employees.

Ward's condition and his ability to get to work on time. Ward himself did not inform MHRI that he believed his arthritis contributed to his tardiness until after he had been suspended in October 1993. On this record, it is not possible to conclude that MHRI discharged Ward because, of an impression that he had a disability or because he had asked for an accommodation to his disability. *Cf. Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16–17 (1st Cir.1997) (finding that discipline and warnings made by employer prior to having knowledge of the alleged disability prove that the firing was not motivated by a request for an accommodation).

Even in opposition to the defendant's motion for summary judgment, Ward has failed to support a causal connection between his arthritic condition and his chronic tardiness. It is fair to say that there is no evidence in the record—save his own general description of how difficult it is for him to get going in the morning—that supports the proposition that Ward was unable, because of his arthritis, to arrive at work sometime within the two-hour window permitted by MHRI.[7]

Finally, even if his arthritis caused Ward to be tardy—a proposition subject to doubt on the present record—and he was then fired "because of" his tardiness, it does not follow that he was fired "because of" the arthritis. The First Circuit has rejected this kind of transitive, "but for" approach to the question of causation for purposes of actions under the ADA. *See Amego*, 110 F.3d at 149 (rejecting as "too broad" the proposition that "conduct connected to a disability always must be considered to be an action 'because of' a disability"); *see also Leary v. Dalton*, 58 F.3d 748, 753 (1st Cir.1995) (discharge of employee who was incarcerated for driving under the influence of alcohol not discharged "because of" alcoholism).

*Hostile Work Environment*

Ward also asserts an ADA claim for the creation of a hostile employment environment. The First Circuit has not yet addressed whether such a cause of action exists under the ADA. Most courts confronting the issue have assumed that it does. *See, e.g., Wallin v. Minnesota Dep't of Corrections*, 153 F.3d 681, 687–88 (8th Cir.1998) (assuming the existence of the cause of action); *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir.1998) (assuming for the "sake of argument" that such a cause of action exists); *Gray v. Ameritech Corp.*, 937 F.Supp. 762, 771 (N.D.Ill.1996) (presuming the existence of the cause of action). Granting Ward the benefit of that assumption, and assuming further that the cause of action "would be modeled after the similar claim under Title VII," *McConathy*, 131 F.3d at 563, Ward nevertheless fails to offer sufficient proof of his claim to overcome MHRI's motion for summary judgment.

To be actionable under Title VII on a hostile work environment theory, the conduct at issue must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)) (internal quotations and brackets omitted); *see also DeNovellis v. Shalala*, 124 F.3d 298, 310–11 (1st Cir.1997). In analyzing the severity or pervasiveness of the alleged harassment, courts "look to the gravity as well as the frequency of the offensive conduct." *DeNovellis*, 124 F.3d at 311. Further, the offensive conduct

---

7. The assertion by his doctor, in a 1998 letter to counsel, that it was his "medical opinion that Mr. Ward did in fact experience difficulty in preparing in the morning for arrival at work in a timely manner due to the symptoms of his arthritis" does not supply the missing support. The statement is too vague and does not address the critical question whether, even with the difficulty noted, Ward was unable to hit a target that was two hours wide. Pl.'s Opp'n to Def.'s Mot. for Summ. J. ¶ 97 at 30–31.

must at a minimum be a "recognizable form" of disability discrimination. *See Morrison v. Carleton Woolen Mills,* 108 F.3d 429, 441 (1st Cir.1997) (discussing sexual hostile work environment). Here, the relatively isolated instances of harassment in the course of Ward's two and one-half year employment do not reach the level of "severe or pervasive" harassment required for a hostile work environment claim. *See Harris,* 510 U.S. at 21, 114 S.Ct. 367.

 Moreover, there is insufficient evidence in the record that officials of MHRI knew or should have known of the occurrence of the harassment. Knowledge of the harassment is a prerequisite for liability under a Title VII analysis. *Morrison,* 108 F.3d at 437; *Sarin v. Raytheon Co.,* 905 F.Supp. 49, 52 (D.Mass.1995). Ward discussed only one incident—the screen saver image—with his supervisor. The other incidents were not mentioned to anyone at MHRI. Based upon a single discussion of one incident, a reasonable factfinder could not conclude MHRI knew or should have known that a hostile work environment existed for Ward, and summary judgment for MHRI is appropriate.

### B. Ch. 151B

Since Massachusetts courts generally "apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. c. 151B," *Wheatley v. American Tel. & Tel. Co.,* 418 Mass. 394, 636 N.E.2d 265, 268 (1994), Ward's state claim must fail for the same reasons as his ADA claim. Ward points to no idiosyncracies of Massachusetts law that call for a different result.

### III. *Conclusion*

For the reasons set forth above, MHRI's motion for summary judgment is GRANTED and judgment shall be entered in favor of MHRI on each of the claims of the complaint.

It is SO ORDERED.