**In re CITIGROUP, INC. Capital Accumulation Plan Litigation**

**Richard H. Gilmore, on behalf of himself and all others similarly situated, Plaintiff, Appellant,**

**v.**

**Citigroup, Inc.; Citifinancial, Inc.; Travelers Group Inc.; Salomon Smith Barney Inc.; Salomon Smith Barney Holdings Inc.; Smith Barney Inc.; Sa-**

lomon Brothers, Inc.; Primerica Financial Services, Inc.; ABC Corps., 1–100; John Does, 1–100, Defendants, Appellees.

**Jerrold E. Slutzky, on behalf of himself and all others similarly situated, Plaintiff, Appellant,**

**v.**

Smith Barney Inc.; Salomon Brothers, Inc.; Citigroup Inc.; Travelers Group Inc.; Salomon Smith Barney Holdings Inc.; Salomon Smith Barney Inc.; Primerica Financial Services, Inc., Defendants, Appellees.

**Nos. 06–2565, 07–1150.**

United States Court of Appeals, First Circuit.

Heard Dec. 4, 2007.

Decided July 24, 2008.

**48**

Bruce H. Nagel with whom Nagel Rice, LLP was on brief, for appellants.

Preeta D. Bansal with whom Thomas J. Dougherty, David S. Clancy, Kara E. Fay, William P. Frank, Sarah E. McCallum, and Skadden, Arps, Slate, Meagher & Flom, LLP were on brief, for appellees.

Before LIPEZ and HOWARD, Circuit Judges, and GELPÍ,[*] District Judge.

LIPEZ, Circuit Judge.

Invoking contract and other state common law claims, appellants Jerrold E. Slutzky and Richard H. Gilmore challenge appellee Citigroup, Inc.'s Capital Accumulation Plan ("CAP"), which gives certain employees the option of receiving part of their compensation as Citigroup stock, awarded at a discounted rate. The dispute arises over the provisions of that plan that require a participating employee to forfeit his unvested shares, and his equivalent monetary wages foregone to purchase those shares, if he voluntarily leaves the company before those shares have vested. Just two of many such challenges filed around the country, Slutzky's action, which originated in the Circuit Court for the Thirteenth Judicial Circuit of Florida, and Gilmore's action, which originated in federal district court in Georgia, were consolidated into a Multi–District Litigation proceeding administered in the District of Massachusetts. The district court dismissed all of appellants' claims, several on

a motion to dismiss for failure to state a claim and the remainder on summary judgment.

After reviewing the terms of the CAP contract agreed to by appellants, we conclude that the forfeiture provisions are unambiguous, and thereby enforceable. That conclusion controls the disposition of the other claims as well. Thus, we affirm the district court's rejection of appellants' claims.

**I.**

**A. CAP Background**

First adopted by the predecessor of Citigroup, Inc. in 1989, the CAP was, and remains, available to certain eligible financial and managerial employees of Citigroup and Citigroup's majority-owned subsidiaries.[1] Designed to retain and motivate employees, the CAP offers an eligible employee the opportunity to receive restricted shares of Citigroup stock at discounted prices on a tax-deferred basis in lieu of cash compensation.[2] The shares are subject to a two- or three-year vesting period after being awarded. During this period, the participating employee may not sell, assign, or otherwise transfer his shares. The participant is, however, entitled to receive regular dividends or dividend equivalents during the course of the restricted period and shall have the right to direct the vote of his shares. After the

---

[*] Of the District of Puerto Rico, sitting by designation.

1. The listed defendants, including Smith Barney Inc., Salomon Smith Barney, Inc., and Primerica Financial Services, Inc., are all subsidiaries of · Citigroup, Inc. Travelers Group Inc. changed its name to Citigroup Inc. following a 1998 merger with Citicorp.

2. We have decided disputes arising from these CAP plans on two prior occasions. *See McCarthy v. Citigroup Global Mkts. Inc.,* 463

F.3d 87 (1st Cir.2006) (vacating a district court's decision that found an arbitration judgment, which denied an employee's various state law challenges to the CAP plan, in manifest disregard of the law); *In re Citigroup, Inc., Capital Accumulation Plan Litig.,* 376 F.3d 23 (1st Cir.2004) (affirming the district court's conclusion that Travelers Group, Inc. had waived its right to arbitrate certain claims related to the CAP plan).

vesting period has lapsed, the employee receives the stock free of restrictions. If the employee resigns before his shares have vested, he forfeits both the non-vested restricted shares and the equivalent amount of compensation that he diverted to purchase those shares.[3] The non-vested shares are subsequently cancelled and revert back to Citigroup.

Appellees maintain that the CAP provides substantial benefits to participating employees. They cite three specific benefits. First, a CAP participant receives stock at a 25% discount. Second, a plan participant may defer taxes on compensation invested in the CAP, pursuant to § 83 of the Internal Revenue Code, until after the purchased shares vest. Finally, a participant who receives restricted stock is entitled to dividends or dividend equivalents during the vesting period, and may also vote his shares.

This case initially involved challenges to two versions of the CAP program: the "payroll" program and the "bonus" program. Although the district court addressed these two plans separately below, the appellants do not raise any separate arguments in their brief with respect to the bonus program. Accordingly, we limit our discussion to the payroll program. Under the general terms of the payroll program, an eligible participant may elect to receive a portion of his earned compensation (typically between 5% and 25%), or none at all, in the form of restricted shares of Citigroup. The shares are purchased at a 25% discount from market value twice a year, with the market value calculated by averaging the month-end closing prices of the stock on the Composite Transaction Tape of the New York Stock Exchange for the six months preceding the month in which the awards are granted. The initial grant of stock under the CAP does not involve the physical delivery of the stock certificates to the participant. Instead, there is a book entry in the participant's name. If a participant voluntarily terminates his employment anytime during the six-month period when a portion of his monetary compensation has been forgone, but the restricted shares have not yet been purchased, the participant receives back his diverted monetary compensation, without interest.[4] CAP participants divert approximately $300 million annually into the plan and, between 1996 to 2000, Citigroup retained approximately $365 million as a result of the CAP forfeitures.[5]

To participate in the payroll program, an eligible employee must initially sign an election form ("Election Form"), and must complete the form again for each six-month accrual period in which he wishes to divert a portion of his compensation to purchase restricted stock. Participation in the program is entirely voluntary. An eli-

---

**3.** Conversely, if a participating employee retires or is involuntarily terminated other than for cause, he forfeits his restricted stock, but receives a cash payment equal to 75% of the fair market value of the forfeited shares, calculated as of the date of the award.

**4.** In other words, if an employee who initially elects to participate in the CAP program resigns during the six-month period before the restricted stock is set aside, the employee may receive the monetary compensation set aside to purchase those restricted shares. However, after that six-month period has lapsed and the stock has been formally set aside for the employee, the two- or three-year restricted period begins and the employee may not receive the stock or the diverted compensation back if he chooses to resign during that time.

**5.** For this $365 million figure, appellants cite Judge Weissbard's opinion in a New Jersey state case that considered statutory and common law challenges to the CAP. *See Rosen v. Smith Barney, Inc.,* 393 N.J.Super. 578, 925 A.2d 32, 45 (2007) (Weissbard, J., concurring in part, dissenting in part), *aff'd,* 195 N.J. 423, 950 A.2d 205 (2008) (per curiam).

gible employee may decide to receive none of his compensation as stock. The Election Form contains specific language addressing the forfeiture of unvested shares and diverted funds in the event a participant voluntarily terminates his employment. One version of the form signed by Slutzky in 1993 states: "I elect to participate in the Capital Accumulation Plan (CAP) for the [relevant period] subject to all of the provisions and administrative rules of the Plan.... I understand if I leave [my employer] voluntarily or am terminated for Cause before the restrictions lapse on these shares, I will forfeit the stock, as well as the money I am hereby authorizing to be paid in the form of such restricted stock." [6]

Prior to receiving the Election Form, an eligible employee also receives a CAP prospectus (the "Prospectus"), which includes an annex that sets forth the full terms of the CAP. On the issue of forfeiture, one version of the Prospectus states: "In the event a Participant voluntarily terminates his or her employment ... prior to the expiration of the Restricted Period, such Participant will forfeit all rights to his or her Restricted Stock." [7] The next paragraph of the same Prospectus then highlights the distinction between an employee who voluntarily terminates his employment and one who is involuntarily terminated without cause or retires. It states: "A Participant who is involuntarily terminated without Cause prior to the expiration of the Restricted Period or who 'retires' from employment ... will forfeit his or her Restricted Stock and receive in return, without interest, a cash payment equal to the amount of his or her compensation that had been paid in the form of Restricted Stock (without taking into account the benefit of any discount applied to the price of the Restricted Stock)." The language of the annex is nearly identical to that of the Prospectus.

After each six-month accrual period has ended and the restricted stock is awarded, the participating employee receives a Restricted Stock Award Agreement (the "RSAA"), which confirms the award of restricted stock to him and provides additional CAP terms. The RSAA also contains specific language addressing the forfeiture of non-vested shares. One version of the agreement provided to Slutzky states that "[i]f the Participant voluntarily terminates employment or if the Participant is involuntarily terminated for Cause, the Participant shall forfeit his or her Restricted Stock." [8] The next paragraph of the same agreement, like the Prospectus, then highlights the distinction between an employee who voluntarily terminates his employment and one who is involuntarily terminated without cause. It reads: "If the Participant is involuntarily terminated without Cause or retires from employment, but does not fall within the definition of Retirement, the Participant shall forfeit his or her Restricted Stock and receive in return, without interest, a cash payment equal to the portion of his or her annual compensation that had been paid in the form of such forfeited Restricted Stock."

### B. Procedural History

This multi-district litigation consists of two independent challenges to the CAP's

---

6. We refer specifically to the Election Form dated June 15, 1993 throughout the opinion.

7. We refer specifically to the Prospectus and annex dated November 30, 1995 throughout the opinion.

8. We refer specifically to the RSAA entered into as of Jan. 3, 1994 throughout the opinion.

forfeiture provisions. The first challenge was filed in Florida by Slutzky, a former employee of Smith Barney, Inc., who represents a class of similarly situated plaintiffs. Slutzky was employed by Smith Barney in Tampa, Florida as a financial consultant, and was later promoted to Vice President of Investments. He voluntarily terminated his employment in 1996 after electing to participate in the CAP payroll program from 1993 until 1995. During that time, he signed several Election Forms, agreeing to receive anywhere from 0–10% of his compensation in the form of restricted stock. When he left the company in 1996, some of his restricted stock had vested while other shares, and the money set aside to purchase those shares, were forfeited.

In January 2000, Slutzky filed a class action complaint against Smith Barney in the Circuit Court for the Thirteenth Judicial Circuit of Florida. Smith Barney subsequently removed the action to federal court and, pursuant to an order of the multi-district litigation panel, the case was transferred to the District Court of Massachusetts. Slutzky asserted six causes of action in his complaint: (1) breach of contract; (2) conversion; (3) unjust enrichment; (4) breach of the covenant of good faith and fair dealing; (5) breach of fiduciary duty; and (6) a request for declaratory judgment on the illegality of the CAP forfeiture policies. The complaint raised no statutory claims.

The district court certified a class of similarly situated individuals, led by Slutzky as class representative. After engaging in discovery, appellees moved for summary judgment against Slutzky, who subsequently cross-moved for summary judgment on his request for declaratory relief. Limiting its discussion to the payroll program, the district court granted appellees' motion for summary judgment and denied Slutzky's cross-motion. The court found that the operative documents governing the CAP were consistent and clear so far as they disclosed that the restricted, non-vested stock, as well as the foregone monetary compensation, would be forfeited in the case of a participant's voluntary termination. Consequently, the court rejected Slutzky's various common law claims concerning the payroll program.[9]

The second challenge to the CAP was filed by Gilmore, who was employed by Salomon Smith Barney, Inc. until 2002. Like Slutzky, Gilmore voluntarily participated in the CAP payroll program and subsequently terminated his employment. In his class action complaint, filed in October 2003, Gilmore asserted four causes of action: (1) breach of employment contract; (2) breach of the CAP contract; (3) conversion; and (4) unjust enrichment. Gilmore also raised no statutory claims.

In March 2004, appellees moved to dismiss Gilmore's complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted appellees' motion with respect to the second and fourth claims, finding that the CAP contract was enforceable because the appellants had conceded that it was not ambiguous. The enforceability of the forfeiture provisions agreed to by the parties also defeated Gilmore's unjust enrichment claim. After limited discovery, in which Gilmore ultimately failed to produce the "employment contract" alleged in his complaint, the district court dismissed Gilmore's remaining claims on summary judgment. *See* Fed. R.Civ.P. 56(c).

The district court entered final judgment in the Georgia and Florida actions on

---

**9.** Slutzky's claims relating to the bonus program were subsequently dismissed as well.

July 25, 2006 and November 28, 2006, respectively. The appellants filed timely notices of appeal in each action, and we consolidated the cases for purposes of this appeal.

## II.

On appeal, we assess both the district court's partial grant of appellees' motion to dismiss under Fed.R.Civ.P. 12(b)(6), as well as the court's grants of appellees' several motions for summary judgment under Fed.R.Civ.P. 56(c), de novo. *See Martin v. Applied Cellular Tech., Inc.,* 284 F.3d 1, 5–6 (1st Cir.2002) (reciting both standards). On the district court's grant of appellees' motion to dismiss, we must affirm unless Gilmore's complaint alleges "a plausible entitlement to relief," *Bell Atl. Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 1967–69, 167 L.Ed.2d 929 (2007); *ACA Fin. Guar. Corp. v. Advest, Inc.,* 512 F.3d 46 (1st Cir.2008), taking all well-pleaded facts contained in the complaint as true and drawing all reasonable inferences therefrom in the plaintiff's favor, *Marrero–Gutierrez v. Molina,* 491 F.3d 1, 5 (1st Cir.2007). Nevertheless, we are free to disregard "bald assertions, unsupportable conclusions, and opprobrious epithets." *Ruiz v. Bally Total Fitness Holding Corp.,* 496 F.3d 1, 4 (1st Cir.2007) (internal quotation marks omitted). In assessing the motions under Fed.R.Civ.P. 12(b)(6), we may also review documents outside of the pleadings where they are undisputed, central to plaintiffs' claims, and sufficiently referred to in the complaint or incorporated into the movant's pleadings, as the relevant CAP documents are here. *Curran v. Cousins,* 509 F.3d 36, 44 (1st Cir.2007).

Evaluating the several grants of summary judgment where no cross-motion was made, "we consider the evidence in the light most congenial to the nonmoving party (here, the plaintiff) and draw all reasonable inferences in that party's favor." *Bennett v. Saint–Gobain Corp.,* 507 F.3d 23, 29 (1st Cir.2007). We must affirm the district court "if—and only if—the record, viewed in that light, discloses no genuine issue as to any material fact and reveals that the movant is entitled to judgment as a matter of law." *Id.; see* Fed.R.Civ.P. 56(c). Finally, addressing the single issue where a cross-motion was made, we must decide " 'whether either of the parties deserves judgment as a matter of law on facts that are not disputed.' " *Barnes v. Fleet Nat'l. Bank, N.A.,* 370 F.3d 164, 170 (1st Cir.2004) (quoting *Wightman v. Springfield Terminal Ry.,* 100 F.3d 228, 230 (1st Cir.1996)).

As a federal court presiding over appellants' respective state law claims, "we must apply the state[s'] law[s] on substantive issues," including the decisions of the highest state courts in Florida and Georgia. *Phoung Luc v. Wyndham Mgmt. Corp.,* 496 F.3d 85, 88 (1st Cir.2007). Where not available or clear, "we may consult other sources as we 'make an informed prophecy' about what rule the state courts would likely follow." *Id.* (quoting *N. Am. Specialty Ins. Co. v. Lapalme,* 258 F.3d 35, 38 (1st Cir.2001)). Nevertheless, our task is limited to applying state law as it currently exists rather than "creat[ing] new rules or significantly expand[ing] existing rules." *Id.; see Catex Vitol Gas, Inc. v. Wolfe,* 178 F.3d 572, 576–77 (1st Cir.1999) ("Relying on pronouncements of the state supreme court and, if these are not conclusive, on other instructive sources, ultimately 'our task is to ascertain the rule the state court would most likely follow under the circumstances, even if our independent judgment on the question might differ.' " (quoting *Blinzler v. Marriott Int'l, Inc.,* 81 F.3d 1148, 1151 (1st Cir.1996))). With these principles in

mind, we address Slutzky's and Gilmore's claims.

## III.

### A. Slutzky's Claims

#### 1. Breach of the CAP Contract

We begin with Slutzky's challenge to the CAP program and its forfeiture provisions. Although Slutzky raises a number of separate claims, his fundamental assertion is straightforward: the forfeiture provisions of the CAP apply only to the restricted shares and not to the earned compensation a participant forgoes to purchase those shares. He supports this conclusion with two alternative theories. First, he argues that the CAP is governed exclusively by the RSAA, the only CAP document signed by both parties. The RSAA states only that the restricted shares are forfeited upon voluntary departure. It does not explicitly mention the earned income used to purchase those shares. As a result, he argues that he is entitled to receive that earned compensation in addition to any interest accrued during the period that appellees possessed the money. According to Slutzky, the appellees' failure to return these funds to him resulted in a breach of the CAP contract, a breach of the parties' employment contract, conversion, unjust enrichment, a breach of appellees' covenant of good faith, and a breach of appellees' fiduciary duty.

In the alternative, Slutzky argues that the forfeiture provisions in the CAP contract are ambiguous. Acknowledging the district court's conclusion that the CAP contract consists of the CAP Election Form, the RSAA, and the Prospectus, Slutzky argues that the forfeiture terms in each document are at odds with one another. Although the CAP Election Form states clearly that non-vested shares *and* the compensation forgone to purchase

those shares are forfeited when a participant voluntarily terminates his employment before the vesting date, neither the Prospectus, which includes the annex, nor the RSAA provide explicitly for the forfeiture of the diverted compensation. Because of the omission in these two documents, Slutzky asserts that the overall contract is ambiguous and must be read in his favor as the non-drafting party. In addition, he notes that forfeiture provisions are highly disfavored in the law, and thus all ambiguities regarding such provisions should be resolved against their existence. Reading the document in light of these principles, Slutzky argues that the forfeiture provisions regarding monetary compensation diverted to the CAP cannot be enforced. As a result, he concludes that the several common law claims he asserts are valid because the appellees, without any clear forfeiture provisions in the CAP contract to rely upon, have no legal basis for withholding a participant's compensation.

We assess in turn these two challenges to the CAP contract.

#### a. The RSAA as the CAP Contract

█ The language of the RSAA itself belies Slutzky's contention that this document alone constitutes the CAP contract. As the district court aptly noted, the RSAA explicitly refers to other documents:

2.1(a) The Restricted Stock shall be subject to the following restrictions and conditions:

(i) *Subject to the provisions of the Plan and this Agreement,* during the two-year period ... commencing on the Date of Award ..., the Participant may not sell, transfer, pledge or assign the Restricted Stock....

(b) Subject to the provisions of Paragraph (a)(1) of this Paragraph 2, the following provisions shall apply to a Par-

ticipant's Restricted Stock prior to the end of the Restricted Period . . . :

(i) Upon the death or Disability of the Participant, the restrictions on his or her Restricted Stock shall immediately lapse.

(ii) If the Participant voluntarily terminates employment or if the Participant is involuntary terminated for Cause, the Participant shall forfeit his or her Restricted Stock.

(iii) If the Participant is involuntarily terminated without Cause or retires from employment, but does not fall within the definition of Retirement, the Participant shall forfeit his or her Restricted Stock and receive in return, without interest, a cash payment equal to the portion of his or her annual compensation that had been paid in the form of such forfeited Restricted Stock.

. . .

16. Entire Agreement. *The Plan, rules adopted by the Committee from time to time and this Agreement* constitute the entire understanding between the parties hereto with respect to the matters covered herein and supersede all previous written, oral or implied understandings between the parties hereto with respect to the subject matter hereof.

(emphasis added). The agreement's references to "the Plan" indicates the parties' intent to incorporate other CAP documents as supplements to the terms of "this Agreement." This intent is unsurprising given the nature of the RSAA. Although it is the only document signed by both parties, it does not purport to provide all of the applicable terms governing the CAP.

For example, the RSAA does not contain any discussion of the amount of compensation a participant has chosen to divert to purchase restricted stock. That figure is contained only in a participant's Election Form. Additionally, only the Prospectus and annex include a full recitation of the CAP terms, including certain information on how the Plan is administered and other general provisions not included in the RSAA or the Election Form.[10] Therefore, by necessity, one must look beyond the RSAA to the other relevant documents in order to ascertain all of the terms of the parties' CAP contract.

■ Reading the CAP contract as the combination of these three documents is consistent with Florida law. When several related documents are executed as part of the same transaction, by the same parties, and concerning the same subject matter, Florida law instructs that the documents be read together. *See Hopfenspirger v. West,* 949 So.2d 1050, 1053 (Fla.Dist.Ct. App.2006) ("Florida law is well-settled that where two or more documents are executed by the same parties at or near the same time, in the course of the same transaction, and concern the same subject matter, they will be read and construed together."); *J.M. Montgomery Roofing Co. v. Fred Howland, Inc.,* 98 So.2d 484, 486 (Fla. 1957). That only one document—the RSAA—was signed by both parties does not alter our analysis. One would expect the Election Form to be signed only by the CAP participant. The Prospectus, which includes the terms of the CAP, does not require any signatures at all. These facts do not mean that these documents are not part of the CAP. *See Dodge of Winter Park, Inc. v. Morley,* 756 So.2d 1085, 1086

---

**10.** The annex to the Prospectus explicitly references the RSAA. It states: "A Participant shall not have any rights with respect to an award, unless or until such Participant has executed an agreement evidencing the award (a 'Restricted Stock Award Agreement') and has delivered a fully executed copy thereof to the Company. . . . "

(Fla.Dist.Ct.App.2000) ("[W]hen a group of simultaneously executed documents are signed in conjunction with a non-signed document, all the documents should be construed as a whole since documents executed as part of a single transaction and concerning the same subject matter must be viewed together.").

Further, although there was necessarily a gap in time between the execution of the Election Form prior to the six-month distribution and the signing of the RSAA, which occurred after the restricted shares were initially awarded to Slutzky, both documents address the same bi-annual transaction and, consequently, the same subject matter. The gap in time between the documents is also a product of the nature of the transaction, which requires that a participant's compensation be accumulated for six months prior to being invested in Citigroup stock. *See Computer Sales Int'l, Inc. v. State, Dep't of Revenue*, 656 So.2d 1382, 1384 (Fla.Dist.Ct.App. 1995) (recognizing that in some circumstances the relevant documents to be construed together need not be executed "at the same time."). Likewise, the Prospectus is delivered prior to an employee deciding to participate in the CAP, so that he may gain a complete understanding of the plan before electing to participate or not. Thus, we conclude that the relevant contract for purposes of interpreting the provisions of the CAP plan is the sum total of the Election Form, the RSAA, and the Prospectus, including its annex.

### b. Ambiguity of the CAP

■ Contrary to Slutzky's argument, these three documents, when read together, are unambiguous on the forfeiture facing a departing CAP participant. *See Dodge City, Inc. v. Byrne*, 693 So.2d 1033, 1035 (Fla.Dist.Ct.App.1997) (finding clarity in the interpretation of several documents

executed concurrently, which together comprise the relevant contract, despite some differences in the specific terms of each document); *see Smith v. Shelton*, 970 So.2d 450, 451 (Fla.Dist.Ct.App.2007) ("Whether an ambiguity exists in a contract also is a question of law."). The Election Form explicitly states that if Slutzky "leaves Smith Barney voluntarily or [is] terminated for Cause before the restrictions lapse on these shares, *[he] will forfeit the stock, as well as the money [he is] hereby authorizing to be paid in the form of such restricted stock.*" (emphasis added). Although the RSAA, the Prospectus, and the annex each omit equivalent language regarding the forfeiture of money, the text included implies a similar result. The documents draw a distinction between the consequences facing a participant who voluntarily terminates his employment from one who is involuntarily terminated without cause or who retires. For a participant who voluntarily terminates his employment prior to the expiration of the restricted period, his restricted stock is forfeited. Conversely, a participant who retires or is involuntarily terminated without cause forfeits his restricted stock, but "receive[s] in return, without interest, a cash payment equal to the portion of his annual compensation that has been paid in the form of Restricted Stock." By negative implication, the conclusion that follows from these two adjacent statements is clear: a participant who voluntarily terminates his employment prior to the restricted period *is not* entitled to receive any wages he previously contributed. Hence, the RSAA and the Prospectus are consistent with the explicit provision on forfeiture of compensation in the Election Form.

Indeed, this conclusion is also mandated by one of the CAP's major benefits, its tax deferral effect. Internal Revenue Code § 83 allows a CAP participant to defer

income taxes on the value of the restricted shares until after the Restricted Period has lapsed, which allows a greater return on one's investment.[11] 26 U.S.C. § 83. This benefit is separate and apart from the additional feature offered by appellee of having Citigroup stock awarded to a participant at a discounted rate. Yet one may benefit from the favored tax treatment established by I.R.C. § 83 only if certain conditions are met. For one, I.R.C. § 83 requires the investment in question to face a "substantial risk of forfeiture."[12] *Id.* § 83(a); *see generally Robinson v. Comm'r of Internal Revenue*, 805 F.2d 38, 40 (1st Cir.1986). Such risk is not present if a participant may at any time prior to the lapse of the restricted period voluntarily terminate his employment and receive a corresponding amount of money to compensate for the forfeited shares. *See* 26 U.S.C. § 83(c)(1) ("The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual."); *see also* 26 C.F.R. § 1.83–3 (offering guidance and examples on applying I.R.C. § 83). Under those circumstances, the participant would be guaranteed the monetary compensation, and, as a result, would be required to claim that amount as income in the initial year. *See* 26 C.F.R. § 1.83–3.

In sum, the three relevant CAP documents, when read together, unambiguously set forth that a participant's voluntary termination of his employment will result in both the forfeiture of any non-vested restricted stock he has elected to receive as well as the underlying monetary compensation foregone to take advantage of the CAP. Slutzky's declarations to the contrary are unpersuasive.

### 2. Breach of Commission Grids

Slutzky also asserts that appellees violated the parties' employment agreement, the terms of which are contained in a set of written commission grids that dictate an employee's level of compensation. He asserts that the commission grids represent a valid and enforceable agreement, distinct from the CAP contract; he argues that this agreement was breached by appellees as a result of their failure to pay appellants the prescribed amounts. Further, Slutzky contests appellees' assertion, which was accepted by the district court, that the terms of the CAP agreement

---

11. The degree to which a participant benefits from the tax deferral depends on a number of factors, including, but not limited to, the participant's marginal income rate in the initial year and the year the restricted stocks vest, the capital gains rate, and the performance of Citigroup stock during that time period.

12. Section 83 provides, in pertinent part:
If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of-
(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or

are not subject to a substantial risk of forfeiture, whichever occurs earlier, over
(2) the amount (if any) paid for such property,
shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.
26 U.S.C. § 83(a).

modified and superseded the terms of the commission grid, thereby effectuating a deviation from the grids' express terms. Slutzky claims that no modification occurred because he neither voluntarily assented to, nor received consideration for, the proposed modification.

In his brief, Slutzky does not cite or reference any specific document containing the commission grids that he asserts serve as a valid and enforceable agreement between the parties. In deciding this issue, the district court relied on a single document offered by him, the "1994 Financial Consultant Compensation Plan," which establishes commission amounts based on a participant's total gross production and what type of product he sold. The district court found that the document made clear that a CAP participant would have a portion of his compensation deducted from the commissions to purchase the restricted shares. Thus, the court concluded that by withholding commissions to purchase the elected shares, appellees were not violating the terms of the commission grid.

Reviewing the 1994 Financial Consultant Compensation Plan, we reach the same conclusion as the district court. The only discussion of the CAP in the document states that a qualifying financial consultant may forgo receiving a percentage of his pre-tax earnings (5, 10, 15, or 20%) as monetary compensation and instead receive it as appellees' stock, at a 25% discount. On the next page, the document offers a table illustrating how the CAP contributions impact a participating brokers' commissions. The table shows that rather than modifying the commissions, the CAP contribution is subtracted from the commissions to produce "Gross W–2 Earnings." As a result of this document, a CAP participant understands that if he chooses to participate in the program, he has agreed not to receive the full commis-

sions amount as earnings, but something less. Thus, there is no failure by appellees to pay the established commission. Instead, there is a decision by a CAP participant to have his commission amount reduced by the amount he elected to receive as stock. The documentation is unambiguous on this point despite Slutzky's protestations to the contrary.

■■■ To the extent that the commission grids did not already incorporate the terms of the CAP, the subsequent election by appellants to participate in the CAP served as a formal modification of those terms. Florida law permits the modification of contracts if such modification is supported by mutual assent and consideration. *See, e.g., Dows v. Nike, Inc.,* 846 So.2d 595, 603 (Fla.Dist.Ct.App.2003) ("Any ... modification requires consent and a meeting of the minds of the parties to the contract whose rights or responsibilities are sought to be affected by the modification."). Unilateral modifications are unenforceable. *Id.*

Slutzky's assertion that neither modification condition was satisfied in this case is without merit. Slutzky signed both the Election Form and the RSAA, which indicate his assent to the unambiguous terms of the CAP contract. *See, e.g., Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Benton,* 467 So.2d 311, 312 (Fla.Dist.Ct. App.1985) ("[A] party who voluntarily executes a document knowing it is intended to establish contractual relationships between the parties ... is bound by its terms in the absence of coercion, duress, fraud in the inducement or some other independent ground justifying rescission."). Moreover, the modification of the commission grids to account for the terms of the CAP involved substantial consideration to Slutzky in the form of the various CAP benefits. As addressed above, a CAP participant may purchase Citigroup stock at a reduced val-

**58**

ue, defer taxes on the value of the restricted stock for the Restricted Period, and receive dividends and vote his restricted shares even before the Restricted Period has lapsed. By electing to participate in the CAP, a participant obtains, and the appellees agree to provide, these benefits. Because the contract was properly modified, the appellees were not obligated to comply with the contract's original, pre-modified terms.

### 3. Other Claims

Slutzky's remaining claims fail as a result of the unambiguous nature of the CAP contract. We briefly address each of the claims in turn.

#### a. Restrictive Covenant

■ Slutzky argues that the forfeiture provisions constitute an unlawful restrictive covenant against competition because a participant is penalized if he chooses to leave the company voluntarily, but suffers no disadvantageous consequences if he dies, becomes disabled, or retires. In support of his assertion that this forfeiture serves as an unlawful penalty, appellant cites an internal Smith Barney memorandum, which he argues suggests that one objective of the CAP is to "punish those who leave and go to a competitor." Slutzky insists that such an objective means that the forfeiture provisions are void as against public policy.

The district court reviewed this issue on cross-motions for summary judgment and concluded that the CAP forfeiture provisions were not unlawful covenants not to compete or void as against any Florida public policy. We agree.[13] Because Slutzky has not established that the forfeiture provisions in fact constitute a covenant against competition, his claim fails. Rather than attaching when a participant decides to work for a competing company, or engage in competing practices on his own, the CAP forfeiture provision becomes operative when one voluntarily leaves the company, regardless of any future employment decision he makes. In other words, the forfeiture occurs whether the participant chooses to work for a competitor or not. The justification courts adopt for rejecting covenants against competition, namely, a recognition "that employees and the general public have a vital interest in freely offering their industry, skills and talents through marketplace competition," *Globe Data Sys. v. Johnson,* 745 So.2d 1101, 1103 (Fla.Dist.Ct.App.1999), is inapplicable in this case where the CAP does not prevent a departing employee from securing gainful employment. Slutzky, or any other CAP participant who voluntarily terminates his employment, may continue to earn a living by using the same skills and knowledge they exhibited working for appellees.

#### b. Conversion

■ Under Florida law, it is "well settled that a conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." *Mayo v. Allen,* 973 So.2d 1257,

---

**13.** The memorandum Slutzky cites in support of his assertion that the CAP violates public policy by punishing departing workers places the statement he cites in context. Rather than establishing that one of the key objectives of the CAP is to " 'punish' those who leave and go to a competitor," the memo merely states that *if* this is one of the objectives, the "current structure of the plan *does not work toward[ ] [this] objective[ ]* because . . . the Plan makes no distinction between 'leaving the business' versus leaving the company to go work for a competitor." (Emphasis added). This statement merely confirms that the CAP forfeiture provisions do not operate to restrict a departing participant from working for a competing company.

1258 (Fla.Dist.Ct.App.2008); *see Star Fruit Co. v. Eagle Lake Growers, Inc.,* 160 Fla. 130, 33 So.2d 858, 860 (1948). The enforcement of a valid, unambiguous contract does not qualify as an unauthorized act. Because the CAP terms were clear, and the contract was entered willingly and voluntarily by Slutzky, the deprivation he alleges was authorized and cannot support a claim for conversion.

### c. Unjust Enrichment

■ To state a claim for unjust enrichment under Florida law, a plaintiff must prove that "(1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla., N.A.,* 667 So.2d 876, 879 (Fla.Dist.Ct.App.1996) (quoting *Hillman Constr. Corp. v. Wainer,* 636 So.2d 576, 577 (Fla.Dist.Ct.App.1994)). However, a plaintiff "cannot pursue an equitable theory, such as unjust enrichment or quantum meruit, to prove entitlement to relief if an express contract exists." *Ocean Commc'ns, Inc. v. Bubeck,* 956 So.2d 1222, 1225 (Fla.Dist.Ct.App.2007); *see Thunder-Wave, Inc. v. Carnival Corp.,* 954 F.Supp. 1562, 1566 (S.D.Fla.1997). Because the parties entered an express contract governing the CAP, Slutzky has no basis for a claim of unjust enrichment. *See Kovtan v. Frederiksen,* 449 So.2d 1, 1 (Fla.Dist.Ct. App.1984) (per curiam) ("It is well settled that the law will not imply a contract where an express contract exists concerning the same subject matter.").

### d. Breach of Covenant of Good Faith and Fair Dealing

■ An element of all contractual relationships under Florida law, the implied covenant of good faith serves to protect the reasonable expectations of the contracting parties. *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,* 896 So.2d 787, 791 (Fla.Dist.Ct.App.2005). It does not serve, however, as an independent contract provision; rather, it attaches to the "performance of a specific or express contractual provision" and "does not exist until a plaintiff can establish a term of the contract the other party was obligated to perform and did not." *Id.* at 792. Therefore, it "cannot override an express contractual provision." *Id.* at 791.

■ Here, Slutzky has failed to show that appellees violated any express term of the CAP contract, nor carried out a discretionary task "capriciously to contravene the reasonable contractual expectations of [Slutzky]." *See Cox v. CSX Intermodal, Inc.,* 732 So.2d 1092, 1098 (Fla.Dist.Ct. App.1999). The appellees merely enforced the express terms of the agreement. Because the parties entered a valid contract, containing clear, unambiguous forfeiture provisions, appellant has no basis for asserting a claim for breach of an implied covenant. *See Snow,* 896 So.2d at 792 (rejecting plaintiff's claim because her complaint failed to link the implied covenant of good faith to a breach of an express provision of her contract with defendant).

### e. Breach of Fiduciary Duty

Finally, Slutzky alleges that appellees breached a fiduciary duty owed to him. According to Slutzky, the employer-employee relationship between the parties created a fiduciary relationship out of which certain duties flowed, and these duties were breached as a result of appellees' failure to award him the earned income and interest he was due on the wages held by appellees.

We do not have to determine whether a fiduciary relationship existed between the parties. No activity engaged in by appellees may be deemed a "breach of duty." The appellees' actions in connection with Slutzky's wages were pursuant to the express and unambiguous provisions of the CAP agreement.[14]

## B. Gilmore's Claims

Gilmore challenges the district court's conclusions related to each of the four claims he raised in his complaint: (1) breach of the CAP contract; (2) breach of the employment contract; (3) conversion; and (4) unjust enrichment. The district court dismissed Gilmore's first and fourth claims on a Rule 12(b)(6) motion and the other claims on a motion for summary judgment.

### 1. Breach of the CAP Contract

Like Slutzky, Gilmore asserts that the CAP contract should be governed by the RSAA, the only document signed by both the CAP participant and appellee. As interpreted by Gilmore, that agreement requires only the forfeiture of the restricted stock upon voluntary termination. Cognizant that this argument might fail, Gilmore also raises various fallback arguments. First, he argues that if the contract consists of all three relevant CAP documents rather than just the RSAA, the contract is ambiguous with respect to the forfeiture provision. As a result, the terms must be construed against the appellees as the drafters. Next, he argues that the Election Form, standing alone, is ambiguous

because, contrary to the language contained in the form, a CAP participant never actually receives any restricted shares during the two year Restricted Period. Finally, Gilmore argues that the forfeiture provisions, if they apply to both the restricted shares and the monetary compensation foregone, violate Georgia common law, the state's public policy, and Georgia Code § 34–7–2, which requires that workers be paid all earnings on a bi-monthly basis.

As discussed above, the CAP contract consists of the three relevant documents: the Election Form, the RSAA, and the Prospectus, including the annex. *See Quintanilla v. Rathur*, 227 Ga.App. 788, 490 S.E.2d 471, 474 (1997) ("[A]n agreement may consist of multiple documents, and when instruments are executed at the same time in the course of a single transaction, they should be read and construed together."); *Rizk v. Jones*, 243 Ga. 545, 255 S.E.2d 19, 20 (1979) (per curiam). Read together, they are unambiguous regarding the scope of the forfeiture provision. Not only does a participant forfeit his restricted shares by voluntarily terminating his employment, but he also forfeits the monetary compensation foregone to receive those shares.

Gilmore's related claims also fail. His assertion that the Election Form is ambiguous is unavailing. That a participant may not sell, assign, or otherwise transfer his restricted shares for a period of two years does not indicate that the shares are not his, or that he remains under-compensated until the shares have completely vested.

---

**14.** On appeal, appellants also assert that appellees' failure to pay interest on a participant's diverted monetary compensation impacts each of their claims. Because Slutzky failed to raise this issue in his complaint or to the district court, it is forfeited. *See, e.g., Rocafort v. IBM Corp.*, 334 F.3d 115, 121 (1st Cir.2003) ("[A] litigant's failure to explicitly

raise an issue before the district court forecloses that party from raising the issue for the first time on appeal.") (internal quotation omitted). Although we have discretion to reach issues not raised below, we decline to do so here because there is no plain error. *See id.* at 122.

Even during the restricted period, the employee maintains the right to direct the vote of his restricted stock and receive any dividends that are disseminated. The text of the Election Form is not ambiguous or misleading with regard to this basic principle of the CAP.

■ Although forfeiture provisions are disfavored under Georgia Law, they are legal and enforceable if they are unambiguous. *See Equitable Loan & Sec. Co. v. Waring*, 117 Ga. 599, 44 S.E. 320, 344 (1903) ("[T]he law permits a man to make a contract which will result in a forfeiture; and, when it is clear from the terms of the contract that the parties have so agreed, a court of law, as well as a court of equity, will enforce the forfeiture."); *see also Russell v. KDA, Inc.*, 206 Ga.App. 397, 425 S.E.2d 406, 408 (1992) (employment context). Addressing the same CAP forfeiture provisions before us in this case, the Court of Appeals of Georgia rejected the plaintiff's several common law claims, finding the provisions unambiguous and therefore enforceable. *See Milhollin v. Salomon Smith Barney, Inc.*, 272 Ga.App. 267, 612 S.E.2d 72, 76–77 (2005) ("When ... the terms of an agreement are clear and unambiguous, the contract must be enforced according to its terms.").

Finally, having failed to raise a statutory claim in his complaint or to the district court, Gilmore may not raise it for the first time on appeal. *See, e.g., United States v. Slade*, 980 F.2d 27, 30 (1st Cir.1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, [it] may not unveil it in the court of appeals."); *Rocafort v. IBM Corp.*, 334 F.3d 115, 121 (1st Cir.2003). The complaint neither asserts a statutory violation nor even mentions an applicable statutory provision. Our assessment echoes that of the district court on this point: "The [appellants] fail[ed] to point to any Georgia law that would invalidate the forfeiture provision." Therefore, we decline to consider Gilmore's arguments under Georgia statutory law, which he raises for the first time on appeal.[15]

### 2. Breach of Employment Contract

■ Like Slutzky, Gilmore also claims that appellees violated his employment contract, as set forth in the written commission grids provided to him, by failing to pay him all of his earned income. Because Georgia and Florida law are consistent on the issues of contract ambiguity and modification, we reject Gilmore's claim as well. *See Am. Water Serv. USA v. McRae*, 286 Ga.App. 762, 650 S.E.2d 304, 306 (2007) ("[W]hen the contract language is clear and unambiguous, construction of the agreement is a matter of law for the court, which must enforce the contract according to its clear terms."); *Thomas v. Garrett*, 265 Ga. 395, 456 S.E.2d 573, 574–75 (1995) ("[T]he modification of a contract may be accomplished by a subsequent mutual agreement of all the parties thereto."). By participating in the CAP, Gilmore elected to have his monetary compensation reduced in return for the opportunity to receive restricted stock. Therefore, the diminished amount that Gilmore received in monetary compensation was a product not of appellees' breach of the employment

---

15. On appeal, Gilmore also raises a claim regarding the appellees' failure to pay him interest earned on his diverted income. Unlike Slutzky, Gilmore raised this claim in his complaint. Nevertheless, he does nothing to advance this claim on appeal. Gilmore has not cited any language or provision in any of the CAP documents indicating that a participant is entitled to such interest. To the extent Gilmore asserts that the law entitles him to interest, notwithstanding the CAP contract's silence on this issue, this argument also fails because he has not set forth any statute or other legal support for this entitlement.

contract, but of his own election to participate in the CAP.

### 3. Conversion & Unjust Enrichment

 Gilmore's remaining claims, for conversion and unjust enrichment, fail in light of the express and unambiguous nature of the CAP forfeiture provisions. To establish a claim of conversion under Georgia law, a plaintiff must show that another party has "assum[ed] and exercise[d] . . . the right of ownership over personal property belonging to [plaintiff], in hostility to his rights; an act of dominion over the personal property of [plaintiff] inconsistent with his rights; or an unauthorized appropriation." *Parker v. Kennon*, 242 Ga.App. 627, 530 S.E.2d 527, 530 (2000). Because Gilmore's ownership right to the restricted stock or its equivalent monetary amount was subject to terms of the CAP agreement, the forfeiture of those items was not "inconsistent with" Gilmore's rights or an "unauthorized appropriation." Therefore, a critical element of Gilmore's conversion claim has not been satisfied. *See Ogletree v. Brokers S., Inc.*, 192 Ga.App. 53, 383 S.E.2d 900, 901 (1989) (rejecting conversion claim where defendant had a statutory and contractual right to repossess the item in question). Further, because the parties entered an express agreement concerning CAP matters, Gilmore's unjust enrichment claim fails. *See, e.g., CS–Lakeview at Gwinnett, Inc. v. Simon Prop. Group*, 283 Ga.App. 686, 642 S.E.2d 393, 398 (2007) ("The law of unjust enrichment applies . . .

only when there is no express contract between the parties."); *Cox v. Athens Reg'l Med. Ctr., Inc.*, 279 Ga.App. 586, 631 S.E.2d 792, 798 (2006) (same).[16]

### C. Certification

As an alternative to resolving appellants' numerous claims on their merits, appellants suggest that we certify to the Supreme Courts of Florida and Georgia the question of "whether the forfeiture provisions of the CAP violate the statutory and/or common law[s]" of the states. They note that currently the Supreme Courts of three states are considering these issues, with two of those three, the Supreme Courts of Massachusetts and Connecticut, doing so in response to certified questions of law entered by the District Court of Massachusetts in conjunction with the multi-district litigation.

 The certification of legal questions to the Supreme Courts of Florida and Georgia is unnecessary in this case. "When state law is sufficiently clear . . . to allow a federal court to predict its course, certification is both inappropriate and an unwarranted burden on the state court." *Manchester Sch. Dist. v. Crisman*, 306 F.3d 1, 14 (1st Cir.2002); *see Hugel v. Milberg, Weiss, Bershad, Hynes & Lerach, LLP*, 175 F.3d 14, 18 (1st Cir.1999). Although the Supreme Courts of Florida and Georgia have not addressed the precise questions before us today, the state law on these issues is clear and well-established.

---

**16.** Our conclusions on the state common law claims are consistent with the judgments of state courts that have decided these issues. *See Rosen v. Smith Barney, Inc.*, 195 N.J. 423, 950 A.2d 205 (2008) (per curiam) (upholding the legality of the CAP forfeiture provisions in the face of statutory and common law challenges); *Schachter v. Citigroup, Inc.*, 70 Cal. Rptr.3d 776 (Cal.Dist.Ct.App.2008), review granted, 76 Cal.Rptr.3d 681, 183 P.3d 383 (Cal.2008); *Kim v. Citigroup, Inc.*, 368 Ill.

App.3d 298, 305 Ill.Dec. 834, 856 N.E.2d 639 (2006) (finding that the state wage act was not violated); *Milhollin v. Salomon Smith Barney, Inc.*, 272 Ga.App. 267, 612 S.E.2d 72 (2005) (rejecting plaintiff's statutory challenge as time-barred and his common law claims on the merits); *see also Marsh v. Prudential Sec. Inc.*, 1 N.Y.3d 146, 770 N.Y.S.2d 271, 802 N.E.2d 610 (2003) (interpreting a New York wage statute to permit a similar stock incentive plan).

*See Crisman,* 306 F.3d at 14 (rejecting certification where the state law at issue is unambiguous). Both states require the enforcement of unambiguous forfeiture provisions, such as those in the CAP contract.

We are also unpersuaded by appellants' reference to the district court's certification of questions to both the Supreme Courts of Massachusetts and Connecticut. The question certified to these state courts was limited to whether the CAP's forfeiture provisions violate a specific state wage statute. In both instances, as the district judge who ordered the certification noted, this statutory question was "an issue of first impression" for the states. Because the question related to a specific statutory provision that the state courts had not previously considered, certification was appropriate. Here, however, the only claims properly asserted arise from the common law. Because the case law on these issues is clear and well-established, certification is inappropriate.

## IV.

For the reasons set forth above, we affirm the judgments of the district court granting appellees' motion to dismiss and several motions for summary judgment.

*So ordered.*