**NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND,**
**et al., Plaintiffs,**

v.

**McKESSON CORPORATION,**
**Defendant.**

**Civil Action No. 07–12277–PBS.**

United States District Court,
D. Massachusetts.

Aug. 26, 2008.

James P. Bennett, Paul Flum, Melvin R. Goldman, Lori A. Schechter, Morrison & Foerster, LLP, San Francisco, CA, Stephen E. Hughes, John A. Kiernan, Bonner, Kiernan, Trebach & Crociata, LLP, Boston, MA, for Defendant.

Steve W. Berman, Barbara Mahoney, Sean R. Matt, Nicholas Styant–Browne, Hagens, Berman, Sobol, Shapiro LLP, Seattle, WA, Edward Notargiacomo, Thomas M. Sobol, Hagens, Berman, Sobol, Shapiro LLP, Cambridge, MA, Jennifer Fountain Connolly, Kenneth A. Wexler, Wexler, Toriseva, Wallace LLP, Chicago, IL, for Plaintiffs.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

In this proposed national class action, Plaintiffs allege that defendant McKesson Corporation ("McKesson"), a drug wholesaler, engaged in unlawful price-fixing by entering into an agreement with First DataBank,[1] a publishing company, to inflate the "average wholesale price" ("AWP") for numerous prescription pharmaceuticals beginning in late 2001. Plaintiffs allege that McKesson's price-fixing scheme violates Section 1 of the Sherman Act and various

---

1. First DataBank is not a party to this action.

state antitrust laws. *See* 15 U.S.C. § 1. The proposed class includes third party payors and consumers that paid for the drugs.

McKesson moves to dismiss the action on the ground that Plaintiffs fail to allege any anticompetitive effects from the conspiracy to increase prices.[2] Plaintiffs tepidly oppose. After hearing, and a review of the submissions, the motion is **AL-LOWED.**

## FACTUAL ALLEGATIONS

The allegations in the Complaint are based on "the same set of operative facts" as those alleged in the Plaintiffs' civil RICO suit. (Compl. ¶ 1). The facts are fully set forth in *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 244 F.R.D. 79 (D.Mass.2007).

Plaintiffs allege that defendant McKesson, a drug wholesaler, and First DataBank, a drug pricing publisher, reached a "continuing agreement" to raise the AWP spread from 20% to 25% for over four-hundred brand-name, self-administered drugs (the "Marked Up Drugs"). (Compl. ¶ 176). Plaintiffs allege that the "price fixing conspiracy" was intended to "cause over-reimbursement ... and thereby increase retail pharmacy profit margins on the sales of the Marked Up Drugs to the detriment of the Classes," all in violation of Section 1 of the Sherman Act and Califor-

nia state antitrust law. (*See id.* ¶¶ 177 (Count I, federal law), 187 (Count II, California state law)). In the alternative, Plaintiffs also assert a violation of various state antitrust laws "[i]n the event that the Court finds that the Plaintiffs in all Classes lack standing under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 [97 S.Ct. 2061, 52 L.Ed.2d 707] (1977)." (*Id.* ¶ 192).

## DISCUSSION

### I. Standard of Review

In order to survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a plaintiff's complaint must allege "a plausible entitlement to relief." *In re Citigroup, Inc.*, 535 F.3d 45, 52 (1st Cir.2008) (quoting *Bell Atl. Corp. v. Twombly*, —— U.S. ——, 127 S.Ct. 1955, 1967, 167 L.Ed.2d 929 (2007)). While this Court will take all of the complaint's well-pleaded facts as true and draw all reasonable inferences therefrom in the plaintiff's favor, it is free to disregard "bald assertions, unsupportable conclusions, and opprobrious epithets." *Citigroup*, 535 F.3d at 52 (quoting *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 4 (1st Cir.2007)).

### II. Per Se or Rule of Reason

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy,

---

**2.** McKesson also contends that plaintiffs lack standing to assert claims under the federal antitrust laws because they did not directly purchase the Marked Up Drugs. As such, they contend that their federal antitrust claims are foreclosed by the direct purchaser rule set forth in *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Plaintiffs counter by arguing that the *Illinois Brick* rule does not apply here because the Plaintiffs are the only ones hurt by the overcharges. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 215 (4th Cir.2002) (holding that an indirect purchaser has standing under the co-conspirator exception to the di-

rect purchaser rule because he or she "is the only party who has paid any overcharges"). Since this presents a thorny issue of statutory jurisdiction, *see California v. ARC Am. Corp.*, 490 U.S. 93, 102–03, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (direct purchaser rule is matter of statutory construction), the court will bypass the issue since, as set forth below, "the outcome on the merits is foreordained." *See Royal Siam Corp. v. Chertoff*, 484 F.3d 139, 144 (1st Cir.2007) (permitting bypassing of thorny issues of statutory jurisdiction where "precedent clearly adumbrates the result on the merits.") (citations omitted).

in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Ordinarily, "antitrust claims under section 1 of the Sherman Act ... require a burdensome multi-part showing ... [through] the so-called rule of reason calculus." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir.2004). However, "[t]he rule of reason does not govern all restraints. Some types 'are deemed unlawful per se.'" *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, — U.S. ——, 127 S.Ct. 2705, 2713, 168 L.Ed.2d 623 (2007) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997)). The "per se" rule deems certain specific categories of restraints necessarily illegal and thus "eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." *Leegin*, 127 S.Ct. at 2713.

■ As an initial matter, Plaintiffs contend that the alleged "conspiracy" in this case qualifies as a "per se" unreasonable restraint on trade. To qualify for "per se" treatment, a defendant's conduct must fall into a category recognized by the courts to have "manifestly anticompetitive effects." *Leegin*, 127 S.Ct. at 2713 (quotation marks omitted). Application of the "per se" standard is only appropriate where "courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Id.* (citations omitted). Because of this rigorous standard, there are "only a couple of 'serious candidates' for "per se" treatment," and the offenses falling under that classification are an "ever narrowing ... niche." *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 51–52 (1st Cir. 1998) (quoting *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir.1993)). "Per se" treatment has thus predominantly (if not exclusively) been applied to horizontal restraints in which the anticompetitive effects are "immediately obvious," such as with "horizontal agreements among competitors to fix prices or divide markets." *Leegin*, 127 S.Ct. at 2713 (citations omitted).

■ While acknowledging that McKesson and First DataBank are not competitors, Plaintiffs argue that this is a "distinction without a difference" because the harm resulting from the alleged price-fixing conduct is logically similar to that caused by the traditional horizontal restraints which trigger the "per se" treatment. However, the very reason that horizontal price-fixing agreements among competitors have specifically been viewed as "per se" violations of Section 1 of the Sherman Act is because the courts have had enough experience with them to know that they "always or almost always tend to restrict competition and decrease output." *Leegin*, 127 S.Ct. at 2713 (quoting *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988)). In contrast, Plaintiffs at hearing conceded that the alleged conspiracy is a "unique case" and that their proposed application of the "per se" standard rests on a "novel theory" that has not yet been brought before the courts. As such, McKesson's alleged conduct does not fall within one of the narrowly recognized categories warranting "per se" analysis under Section 1 of the Sherman Act.

### III. Quick Look Analysis

As a fallback, Plaintiffs argue that their claims, while novel, merit the application of a "quick look" analysis under the rule of reason. The Supreme Court has held that a "quick look" analysis may be applied to claims that do not fit neatly into one of the requisite categories meriting "per se" treatment but nonetheless present allegations that give rise to an "intuitively obvi-

ous inference of an anticompetitive effect." *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 780–81, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999) (holding that a "quick look" was not sufficient to justify the conclusion that an advertising restriction adopted by a trade association violated the antitrust laws). Some conspiracies are so facially anticompetitive that "no elaborate industry analysis is required to demonstrate the anticompetitive character of such ... agreement[s]." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). When faced with such a conspiracy, the Court will evaluate "the alleged justification[ ]" by the defendant and "only the briefest inspection" is required to "reject the excuses and strike down the agreements." *U.S. Healthcare*, 986 F.2d at 595. Significantly, this "quick look" analysis has primarily been applied to horizontal agreements among competitors, the anticompetitive effects of which were obvious to the Court. *See, e.g., FTC v. Indiana Fed. of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); *NCAA v. Board of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

Upon review of the allegations in the Complaint, and with extensive knowledge of the fraud litigation which forms the foundation of this suit, this Court disagrees that McKesson's alleged conduct was so facially anticompetitive as to warrant a "quick look" analysis. Indeed, Plaintiffs do not explain how there are any anticompetitive effects at all, other than to say in conclusory fashion that McKesson gained an unfair advantage over competitors due to the "good will" generated by the illegal scheme. The alleged conspiracy involves an agreement between non-competitors (a publisher and a wholesaler) to state fraudulent drug prices so that pharmacies will have a better profit margin, and the injured parties are the third party payors that made reimbursements and the consumers that had to pay higher co-insurance payments for their drugs. This was not a horizontal conspiracy among wholesalers or pharmacies to inflate prices. The anticompetitive effects of this agreement are not obvious to this Court, making a "quick look" analysis inappropriate.

## IV. Rule of Reason Analysis

Plaintiffs finally contend that even if their claims do not fall into the "per se" category or warrant a "quick look" analysis, they have pleaded facts sufficient to establish a plausible Sherman Act Section 1 violation under the rule of reason. The First Circuit has held that the rule of reason requires an onerous multi-part showing:

■   that the alleged agreement involved the exercise of power in a relevant economic market;

■   that this exercise had anti-competitive consequences;

■   and that those detriments outweighed efficiencies or other economic benefits.

*Stop & Shop Supermarket Co.*, 373 F.3d at 61 (emphasis added). "In its design and function the rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin*, 127 S.Ct. at 2713.

■   In analyzing Plaintiffs' claim under the rule of reason, there is no allegation that McKesson reduced competition in any relevant economic market. The Complaint merely gives the blanket assertion that "[p]laintiffs ... paid higher prices for the Marked Up Drugs than they would have paid but for Defendant's anticompetitive conduct," without going any further to allege how the conduct resulted in a reduc-

tion of competition in a relevant market. (Compl. ¶ 179). But Plaintiffs are mistaken in flagging pricing effects without the concomitant showing of anticompetitive conduct. *Leegin,* 127 S.Ct. at 2718. Such a "bald assertion" is insufficient to withstand a motion to dismiss. *Citigroup,* 535 F.3d at 52; *see Twombly,* 127 S.Ct. at 1967–1969. In fact, Plaintiffs have all but conceded that their claim fails if they are required to demonstrate anticompetitive effects resulting from McKesson's alleged conduct. (Hr'g Tr. at 16.)

McKesson's conspiracy to charge higher prices is not itself sufficient to establish "antitrust injury." While "both antitrust and ordinary contract or tort claims may sometimes arise out of the same body of conduct," antitrust claims are concerned "with conduct that stifles competition." *Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.,* 357 F.3d 1, 4 (1st Cir.2004) (citations omitted); *see also Turner v. Johnson & Johnson,* 809 F.2d 90, 102 (1st Cir.1986) (upholding dismissal of antitrust claims where alleged injury to plaintiffs "unquestionably flowed from the alleged fraud and not from suppressed competition in the electronic thermometer market"). When presented with a conspiracy between a telephone carrier and a telephone equipment removal service to artificially increase prices for consumers, the Supreme Court affirmed the dismissal of the antitrust complaint holding that while the defendant's conduct "hurt consumers by raising telephone service rates," the increased rates did not result from "a less competitive market for removal services." *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 136, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). Plaintiffs have thus failed to plausibly allege a claim under Section 1 of the Sherman Act.

## V. State Law Claims

The parties seem to concede that the state antitrust laws follow federal law re-

garding the requirement of an antitrust injury. (Docket No. 15 at 21 n. 27). Accordingly, these claims fail as well.

### ORDER

The motion to dismiss is **ALLOWED** (Docket No. 12).